UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DEONTAY DEMARC BLACKWICKLIFFE,

                    Petitioner,                Case No. 1:16-cv-1223

v.                                          Honorable Janet T. Neff

THOMAS WINN,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254. Petitioner Deontay Demarc Blackwickliffe presently is incarcerated at the Carson City
Correctional Facility. On June 22, 2014, Petitioner, represented by retained counsel, entered a plea
of *nolo contendere* to one count of second-degree murder, MICH. COMP. LAWS § 750.317, three
counts of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and one count of
felony-firearm, MICH. COMP. LAWS § 750.227b. After his plea, but before sentencing, Petitioner,
through new counsel, moved to withdraw his plea, claiming that his first attorney had rendered
ineffective assistance of counsel. On September 18, 2014, the date of sentencing, the court
conducted a hearing on the motion. The court denied relief and proceeded to sentence Petitioner to
concurrent prison terms of 28 years to 63 years on the second-degree murder conviction and 21
years to 50 years on each assault with intent to murder conviction, all consecutive to a 2 year term
on the felony-firearm conviction. In his *pro se* petition, Petitioner raises one ground for relief, as
follows:

Counsel's Ineffectiveness Created Prejudice.

(Pet., ECF No. 1, PageID.6.) Respondent has filed an answer to the petition (ECF No. 5), stating

that the petition should be dismissed because it lacks merit. Upon review and applying the AEDPA

standards, I find that the petition is without merit. Accordingly, I recommend that the petition be

denied.

## **Procedural History**

### A.    **Trial Court Proceedings**

The state prosecution arose from a shooting at a house in Muskegon on December

20, 2013, during which Petitioner fired ten shots, killing one man, Gary Ogreen, and seriously

injuring three other people. Petitioner was charged with one count of open murder, three counts of

assault with intent to commit murder, and possession of a firearm during the commission of a felony.

A preliminary examination was held on February 12, 2014. During the preliminary

examination, four witnesses testified that they were at the house at the time of the shooting.

Nicholas Gifford testified that he had been at Club Envy before joining friends of his

at the party at 2357 McMillan Road, Kolton Chauvez' house. Gifford arrived at around 2:00 a.m.

(Prelim. Exam. Tr., ECF No. 6-2,[1] PageID.171-172.) Others at the party included Cody Sharlow,

Julius Pamer, Mason Ocharzak, Gary Ogreen, and Kolten Chauvez. (*Id.*, PageID.170.) Between

3:00 and 3:30 a.m., approximately four cars drove into the driveway. (*Id.*, PageID.172.) Gifford

walked outside with Chauvez, Pamer, and Ogreen. They advised the individuals in the vehicles that

they were not welcome at the house. Gifford knew only one person in the vehicles, Alex Bumstead.

---

[1]The Court notes that the Respondent has filed two copies of the transcript of the preliminary examination, which are docketed as ECF No. 6-2 and ECF No. 6-3. ECF No. 6-2 is docketed as only the testimony of Alex Bumstead, but in fact, like ECF No. 6-3, ECF No. 6-2 contains the entire record of the preliminary examination)

(*Id.*, PageID.174.) Most of the people left, and Gifford stepped back inside the house. (*Id.*, PageID.175.) However, he learned that one of the vehicles was stuck in the snowy driveway. (*Id.*, PageID.176.) Gifford went outside and joined with others to push the vehicle out. Shortly before Gifford went outside to push the vehicle, Pamer got into a fight with Tone Wiggers, whom Gifford recognized, because he had previously seen Wiggers with Bumstead. (*Id.*, PageID.177, 179.) Gifford saw only the end of the fight, and he saw a girl running around and screaming. (*Id.*, PageID.179.) According to Gifford, at the end of the fight, Wiggers had a bloody face and was lying on the ground. (*Id.*, PageID.180.) After the car was pushed out of the snow, Gifford again walked toward the house. He then saw flashes of light and heard loud noises, which he initially thought were firecrackers. Gifford felt a warm, stinging sensation in his right leg, and he found that he could not walk. He realized that the sounds were gunshots as he crawled back to the house. (*Id.*, PageID.181-182.) As a result of being shot, Gifford's right femur was broken. (*Id.*, PageID.182-183.) He did not see the person who shot him. (*Id.*, PageID.183.) When he crawled into the house, he saw Cody Sharlow lying down, injured. He also could hear Ogreen in the kitchen making sounds. (*Id.*, PageID.184-185.) Gifford testified that neither he, nor Pamer, nor Sharlow, nor Ogreen had a weapon of any kind. (*Id.*, PageID.186.)

Cody Sharlow testified that he was at Kolton Chauvez's house at 3:30 a.m. on December 21, 2013. (*Id.*, PageID.195.) Others present that evening included Chauvez, Ogreen, Pamer, Gifford, Joel Johnson, and Mason Ocharzak, among others. (*Id.*, PageID.196-197.) Sharlow also had been to Club Envy before arriving at the party at about 3:00 a.m. Sharlow sat on the couch watching cartoons after the uninvited people arrived, until Johnson came inside and got him. Sharlow went out onto the porch. (*Id.*, PageID.197-198.) Others outside the house included

Derrick Chesney, Ogreen, Pamer, Gifford, and Ocharzak. (*Id.*, PageID.199.) He did not see either Chauvez or Kolten. (*Id.*, PageID.199-200.) Sharlow walked to the end of the porch by the driveway, and he saw a woman assisting Tone Wiggers, whom he did not know at the time, to get up from the ground. Wiggers was bleeding from his face. (*Id.*, PageID.200-201.) Sharlow also saw Pamer walking up to the porch, shirtless. It appeared to Sharlow that Pamer and Wiggers had been fighting. (*Id.*, PageID.201.) Sharlow testified that none of the people he was with had a gun or any other weapon. (*Id.*, PageID. 202-203.) He heard no threats from them, either. (*Id.*, PageID.203.) Mr. Ogreen was standing a few feet in front of the porch. Sharlow heard him say, [T]hey're leaving." Thinking that the uninvited persons were leaving, the others stood on the porch, talking. Then two men, Petitioner and another person, walked toward them. (*Id.*, PageID.204-205.) Sharlow suddenly heard what sounded like fireworks and saw a flashing gun from Petitioner's direction. Sharlow turned to go into the house, but he was shot and fell to the ground. He heard about seven or eight shots, and he could feel the bullets going past him. (*Id.*, PageID.206, 215.) Sharlow testified that he was shot in the right hip. His injury required surgery, and he was in the hospital for ten days. (*Id.*, PageID.207.) In the house, Sharlow saw Pamer and Gifford, both of whom were also in the house. He also heard others trying to assist Gary Ogreen. (*Id.*, PageID.208.)

Julius Pamer testified that he had been staying at the Chauvez house for about 40 days, living with Ogreen and Chauvez. (*Id.*, PageID.219.) About 13 people were at the house as invited guests, including Sharlow, Gifford, Ogreen, Chauvez, Johnson, Ocharzak, and others. (*Id.*, PageID.219-220.) At about 3:30 a.m., about six cars showed up at the house. Pamer, Ogreen, and Chauvez went down the driveway to tell them that they were not welcome. All of the cars, except one, left after being told. (*Id.*, PageID.220-221.) Pamer got into a fight with one African American

man, whom he did not know. He testified that he began to fight when the man was told he needed to leave, but instead took his coat off and started coming at Pamer. (*Id.*, PageID.221-222.) Pamer also took his shirt off. During the fight, Pamer knocked the person to the ground and kicked him in the face. (*Id.*, PageID.222.) After the fight ended, a couple of other people came and picked up the man from the yard. Pamer walked to the house and stood on the porch. When the shots began, he ran inside, but he was hit in the buttocks. (*Id.*, PageID.223, 225.) Pamer remembered that Johnson was also on the porch when the shooting began. (*Id.*, PageID.223.) Pamer saw Alex Bumstead in the group who arrived, but he did not think that Bumstead was the shooter. (*Id.*, PageID.224-225.) He did not see who fired the gun. (*Id.*, PageID.225.) Pamer denied having a gun or other weapon, and he denied making any threats. (*Id.*, PageID.226-227.)

Alex Bumstead testified pursuant to a plea agreement, in which he agreed to testify in exchange for having the open-murder charge against him reduced to involuntary manslaughter. (*Id.*, PageID.234, 236-237.) Bumstead testified that he had no weapon the night of the shooting. He had gone to Club Envy earlier that night, because it was his birthday. (*Id.*, PageID. 238.) When the club closed, he left with Meghan Lehner, Amanda Day, and Alix Parker. They went to meet up with Antonio Wiggers (Tone). (*Id.*, PageID.239, 241.) In a parking lot, Bumstead met Petitioner, Raymond Coleman and Wiggers, who were traveling in the same vehicle. In addition, Tony Miller and his girlfriend Rachel and a man named Adrian were in another vehicle. A fourth red car also joined them, though Bumstead did not know the people. (*Id.*, PageID.241-242.) The four vehicles drove to the party on McMillan Road. The group knew about the party through Meghan Lehner, who was told about it by Dakota and Nick Gifford. (*Id.*, PageID.242.) After they pulled into the driveway, they were told to leave. Three of the cars left, including Coleman's car, in which

Petitioner was riding. Lehner's car, however, became stuck on the left side of the driveway. (*Id.*, PageID.243-245.) Bumstead asked Wiggers to push the car, because Bumstead had an injury. (*Id.*, PageID.245.) Wiggers was approached by Julius Pamer about the car not having left. The two had an argument, which led to a fist-fight. During the fight, Wiggers was knocked out and injured. (*Id.*, PageID.246-247.) Bumstead acknowledged that Pamer had no weapon during the fight, and no one else had a weapon. (*Id.*, PageID.247, 259.) The fight ended when Pamer kicked Wiggers in the head a couple of times. Sharlow went down the driveway to get help for Wiggers. There, he contacted Raymond Coleman and Petitioner, who were waiting in Coleman's car. (*Id.*, PageID.249, 252.) According to Bumstead, Petitioner was known to carry a gun, and he had seen Petitioner with a gun before, though not with a handgun. (*Id.*, PageID.251.) Petitioner got out of the car and went with Bumstead back to the house. As they walked, Petitioner took a handgun out of his waistband. (*Id.*, PageID.252-253.) Bumstead pointed out Pamer, who was standing on the porch. Petitioner fired about ten shots at the porch, where five or six people were standing, sweeping his firearm side to side. (*Id.*, PageID.254-255.) Petitioner then went back to Coleman's car, as did Bumstead and Wiggers, and they all drove to Coleman's house. (*Id.*, PageID.257.)

Following the testimony of these four, the court found probable cause that Petitioner had committed the charged offenses and bound Petitioner over for trial. (*Id.*, PageID.275.)

At a hearing held on July 22, 2014, the day set for trial, Petitioner pleaded no contest to second-degree murder, three counts of assault with intent to commit murder, and felony firearm, in exchange for a dismissal of the first-degree murder charge. The plea also was based on a *Cobbs* agreement, providing that Petitioner's minimum sentence would not exceed 28 years on the substantive offenses, plus 2 years on the felony-firearm charge. A new charging document was

presented to the court. (Plea Tr., ECF No. 6-4, PageID.409-410.) As a factual basis for the plea, Petitioner agreed that the court could rely on the death certificate and the preliminary hearing transcript. (*Id.*, PageID.419-420.) Based on the agreed record, the court found Petitioner guilty of all five charges to which he had pleaded no contest. It also found that Petitioner's pleas were knowing, voluntary, understanding, and accurate, and it accepted the pleas. (*Id.*, PageID.420-421.)

On August 7, 2014, by stipulation and order, new defense counsel was substituted in the case. (Case Register, ECF No. 6-1, PageID.146.) At a hearing held on August 25, 2014, the court considered and granted the motion of defense counsel to adjourn the sentencing hearing until September 18, 2014. (Tr. of Hr'g on Mot. to Adjourn, ECF No. 6-5, PageID.438.) On September 17, 2014, defense counsel filed a motion to withdraw the plea. (Case Register, ECF No. 6-1, PageID.146.)

The trial court heard the motion at the sentencing hearing on September 18, 2014. (Sentencing Hr'g Tr., ECF No. 6-6.) Counsel represented that Petitioner claimed he was innocent of the charges and had wanted to go to trial, but his attorney misrepresented his family's recommendation that he enter a plea. Petitioner therefore claimed that prior counsel was ineffective and that Petitioner should be entitled to withdraw his plea. (*Id.*, PageID.445-446, 448.) The prosecutor responded that, according to jail phone calls, Petitioner suggested that his intent in withdrawing the plea was to get a better deal, hoping that he could negotiate a minimum sentence that would not exceed 20 years. (*Id.*, PageID.451.) In a lengthy decision from the bench, the trial court denied the motion to withdraw the plea. (*Id.*, PageID.465-471.) The court then proceeded to sentence Petitioner to 28 to 63 years on the murder conviction, 21 to 50 years on each conviction

for assault with intent to murder, and 2 consecutive years on the felony-firearm conviction.  (*Id.*, PageID.485.)

## B.    Direct Appeal

Petitioner filed an application for leave to the Michigan Court of Appeals.  His brief, which was filed by counsel on March 18, 2015, raised the following issue:

> I.    THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED [PETITIONER'S] PRESENTENCE MOTION TO WITHDRAW HIS NO CONTEST PLEA WHEN WITHDRAWAL WAS IN THE INTEREST OF JUSTICE AND THE PLEA WITHDRAWAL WOULD NOT CAUSE SUBSTANTIAL PREJUDICE TO THE PROSECUTION.

(Def.-Appellant's Br. on Appeal, ECF No. 6-7, PageID.494.)   In his motion, Petitioner argued the issue presented in this habeas action:  his first attorney was ineffective in not adequately explaining the advantages and disadvantages of accepting the plea, in coercing him to plead by telling him he had no choice, and coercing him by inaccurately telling him that his family wanted him to plead no contest.  In an order issued on May 7, 2015, the Michigan Court of Appeals denied leave to appeal for lack of merit in the grounds presented.  (Mich. Ct. App. Order, ECF No. 6-7, PageID.489.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court, raising the same issue presented to and rejected by the Michigan Court of Appeals.  By order entered on October 28, 2015, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (Mich. Ord., ECF No. 6-8, PageID.754.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-

court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

Petitioner presents only one issue in his habeas petition: that his plea was involuntary because his trial attorney was ineffective.[2] Petitioner contends that his attorney failed to file unspecified motions, failed to consult with Petitioner about important issues concerning possible witnesses, failed to keep Petitioner informed about any investigation, and untruthfully told him that his family wanted him to plead guilty.

---

[2]Petitioner no longer argues that the denial of his motion to vacate the plea constituted an abuse of discretion. That undoubtedly is because a state defendant has no constitutionally guaranteed right to withdraw a guilty plea. *See Carwile v. Smith*, 874 F.2d 382 (6th Cir. 1989). The only constitutional challenge that a habeas court may entertain with regard to a plea of guilty is that the plea was not entered in a knowing and voluntary fashion under the standards set forth in *Boykin v. Alabama*, 395 U.S. 238 (1969). A habeas court is restricted to these federal principles, and may not grant habeas relief on the basis of state law governing the taking or withdrawal of guilty pleas. *Riggins v. McMackin*, 935 F.2d 790, 794-95 (6th Cir. 1991). As a result, even had Petitioner raised the state-law claim, it would have been denied as noncognizable.

It has long been the case that a valid guilty plea bars habeas review of most non-jurisdictional claims alleging antecedent violations of constitutional rights. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Among claims not barred are those that challenge "the very power of the State to bring the defendant into court to answer the charge against him," *Blackledge v. Perry*, 417 U.S. 21, 30 (1974), and those that challenge the validity of the guilty plea itself. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Haring v. Prosise*, 462 U.S. 306, 320 (1983); *Tollett*, 411 U.S. at 267. A plea not voluntarily and intelligently made has been obtained in violation of due process and is void. *See McCarthy v. United States*, 394 U.S. 459, 466 (1969). Petitioner's claim does not challenge the power of the state to bring him into court. Thus, the only means available for challenging his conviction is to claim that his plea is invalid, i.e., it was not knowingly and voluntarily entered into. *See Mabry v. Johnson*, 467 U.S. 504, 508 (1984) ("It is well-settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.").

The test for determining a guilty plea's validity is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill*, 474 U.S. at 56 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Courts assessing whether a defendant's plea is valid look to "all of the relevant circumstances surrounding it," *Brady v. United States*, 397 U.S. 742, 749 (1970), and may consider such factors as whether there is evidence of factual guilt. While courts may consider whether a factual basis for a guilty plea exists in their assessments of its validity, it has generally been held that the Constitution does not require that they ensure such a basis exists. *See Higgason v. Clark*, 984 F. 2d 203, 208 (7th Cir. 1993) ("Strong evidence of guilt may suffice to sustain a conviction on an *Alford* plea, and may be

essential under FED. R. CRIM. P. 11, but it is not necessary to comply with the Constitution.")

(intentional quotations omitted); *see also Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000);

*Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1983); *Thundershield v. Solem*, 565 F.2d 1018 (8th

Cir.1977); *Edwards v. Garrison*, 529 F.2d 1374, 1376 (4th Cir.1975); *Roddy v. Black*, 516 F.2d

1380, 1385 (6th Cir. 1975); *Freeman v. Page*, 443 F.2d 493, 497 (10th Cir. 1971).

   In order to find constitutionally valid guilty plea, several requirements must be met.

The defendant pleading guilty must be competent, *see Brady*, 397 U.S. at 756, and must have notice

of the nature of the charges against him, *see Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976);

*Smith v. O'Grady*, 312 U.S. 329, 334 (1941). The plea must be entered "voluntarily," i.e., not be

the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of

the defendant" or of state- induced emotions so intense that the defendant was rendered unable to

weigh rationally his options with the help of counsel. *Brady*, 397 U.S. at 750; *Machibroda v.

United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which

deprive it of the character of a voluntary act, is void."). The defendant must also understand the

consequences of his plea, including the nature of the constitutional protection he is waiving.

*Henderson*, 426 U.S. at 645 n.13; *Brady*, 397 U.S. at 755; *Machibroda*, 368 U.S. at 493 ("Out of just

consideration for persons accused of crime, courts are careful that a plea of guilty shall not be

accepted unless made voluntarily after proper advice and with full understanding of the

consequences.") (internal quotations and citation omitted). Finally, the defendant must have

available the advice of competent counsel. *Tollett*, 411 U.S. at 267-68; *Brady*, 397 U.S. at 756;

*McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970). The advice of competent counsel exists

as a safeguard to ensure that pleas are voluntarily and intelligently made. *Cf. Henderson*, 426 U.S.

at 647 ("[I]t may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit."); *Brady*, 397 U.S. at 754 (suggesting that coercive actions on the part of the state could be dissipated by counsel). Ineffective assistance of counsel will render a plea of guilty involuntary. *See Hill*, 474 U.S. at 56-57.

When a state defendant brings a federal habeas petition challenging the voluntariness of his plea, the state generally satisfies its burden of showing a voluntary and intelligent plea by producing a transcript of the state-court proceeding. *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993); *see also McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *Garcia*, 991 F.2d at 326). Where the transcript is adequate to show that the plea was voluntary and intelligent, a presumption of correctness attaches to the state court findings of fact and to the judgment itself. *Garcia*, 991 F.2d at 326. A satisfactory state-court transcript, containing findings after a proper plea colloquy, places upon petitioner a "heavy burden" to overturn the state findings. *Id.* at 328; *see also Parke v. Raley*, 506 U.S. 20, 29 (1992) (holding that the factual findings of voluntariness made by the state court are entitled to a presumption of correctness); *Blackledge v. Allison*, 431 U.S. 63, 73 (1977) (a solemn plea of guilty presents a "formidable barrier" to a subsequent claim to the contrary).

Respondent has supplied the transcript of the plea hearing. According to the transcript, Petitioner agreed that he understood the prosecutor's description of the offenses, their potential consequences, and the scope of the plea agreement. (Plea Hr'g Tr., ECF No. 6-4, PageID.409-412.) The record reflects that the no-contest plea was being entered because of Petitioner's potential civil liability. (*Id.*, PageID.410, 417.) The court walked Petitioner through the sentencing consequences, including providing a chart of the sentence operation and explaining

in detail how the sentences for the substantive offenses would run consecutively to the felony-firearm sentence. (*Id.*, PageID.412-414.) The court also explained that the plea agreement functioned solely as the minimum, that the maximum had not been promised by the court, and that the amount of time Petitioner actually served would determined by the parole board, not by the court. (*Id.*, PageID.414-415.) Petitioner expressed his understanding. The court offered Petitioner time to speak with his attorney before continuing, and Petitioner did so. (*Id.*, PageID.414.) The court then explained the types of pleas that could be entered and the fact that a no-contest plea would operate like a guilty plea. (*Id.*, PageID.415.) In addition, the court explained that, before sentencing, a presentence report would be prepared, to which Petitioner would have the opportunity to object or clarify. (*Id.*, PageID.416.) Only after these detailed explanations, which Petitioner indicated he understood, did the court ask Petitioner for his plea to each of the various counts. (*Id.*, PageID. 416-417.) Petitioner provided clear and intelligent responses to the court's questioning. (*Id.*, PageID.412-419.) Petitioner also advised the court that he had attended school through the twelfth grade, but had not graduated. (*Id.*, PageID.418.) He denied that he had been made any promises other than those in the plea agreement. (*Id.*, PageID.417-418.) He denied being threatened or coerced. (*Id.*, PageID.418.) He stated that he was making the decision to plead guilty of his own free choice. (*Id.*) He acknowledged that he had received and signed an advice-of-rights form and had read it carefully. (*Id.*) He specifically denied having any questions about the rights he was waiving. Further, when the court specifically advised that he was giving up any claim that his plea was the result of secret promises or threats not disclosed, he indicated that he understood. (*Id.*, PageID.419.) He also agreed that, in pleading guilty, he understood that he was giving up his right to an appeal by right. Petitioner further acknowledged that he understood that his trial no longer was

going to happen. (*Id.*, PageID.421.) At the end of the colloquy, the court indicated that it had read the transcript of the preliminary examination and had reviewed the death certificate, the documents on which the parties had agreed he should base his plea. (*Id.*, PageID.419-420.) The court found that the documents established the Petitioner was guilty of the charges to which he entered a no-contest plea. The court concluded that the pleas were "knowing, voluntary, understanding and accurate." (*Id.*, PageID.420.) The court therefore accepted all five pleas. (*Id.*)

The plea transcript clearly establishes that the plea was voluntary and intelligent, in light of the testimony of the witnesses at the preliminary examination. The trial court's factual findings of voluntariness and understanding were clearly supported and are therefore entitled to a presumption of correctness, which Petitioner has a heavy burden of overcoming. *Parke*, 506 U.S. at 29; *Blackledge*, 431 U.S. at 73; *Garcia*, 991 F.3d at 326.

To meet his burden of showing that his plea was involuntary, Petitioner argues that his first attorney rendered ineffective assistance of counsel in a number of ways. He contends that his attorney did not meet with him sufficiently, did not prepare sufficiently or file motions, did not keep Petitioner informed, and coerced Petitioner by telling him that he had no choice but to plead to the charges. Petitioner also argues that his attorney lied to him about his family's wishes, representing that they wanted him to plead guilty. Petitioner claims that counsel coerced him by the misrepresentation.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient

performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The two-part *Strickland* test applies to challenges to guilty pleas based on ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Regarding the first prong, the court applies the same standard articulated in *Strickland* for determining whether counsel's performance fell below an objective standard of reasonableness. *Id.* In analyzing the prejudice prong, the focus is on whether counsel's constitutionally deficient performance affected the outcome of the plea process. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*. at 59.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles*

*v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (guilty plea context); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The trial court rejected all of Petitioner's claims of ineffective assistance, as follows:

Ineffective assistance of counsel. This is something - this is an issue that is present in every criminal case and it's argued here. The challenge for the Court is this. Identifying the effective assistance of counsel is generally a subjective task. The Court sees defense attorneys in this Court and all over the nation who create a huge file by filing a lot of motions and a lot of them don't have much merit. The prosecutor has seen other attorneys who don't file those kind of motions who either are respected or have good negotiating skills or perhaps have a real good relationship with the prosecutor's office or has a prosecutor who understands the dynamic of the case and can sometimes negotiate a pretty favorable deal with less effort. So the amount of time spent is something I think the Court has to consider, but I don't know that it is the - and certainly is a factor but I don't know that it's the controlling factor. In other words, if the defense attorney with Mr. Black-Wickliffe had spent 150 hours on the case but if he pled guilty to the open murder charge I don't think anybody would consider that to be effective assistance of counsel. So there's a balancing here.

As the Court evaluates the result, the result obtained for Mr. Black-Wickliffe was substantial. His former counsel secured a dismissal of the open murder charge essentially and he secured a plea to the murder second degree charge near the bottom of the guidelines. It looks like the guidelines are probably, and we aren't getting to the sentencing part first, 315 months is the bottom. That's 26 years and some change. And on that charge, the murder count, the sentence negotiated is 28 years. So the result obtained here is pretty substantial and I think that refutes claims of ineffective assistance of counsel.

The Court also notes that Mr. Swanson was retained. This is not a beleaguered public defender unable to adequately represent his client. He's retained. And Mr. Swanson was involved in the case at the preliminary examination as of February 12, 2014 and he managed the case until its plea on July 22 and there was

never a hint of anything brought to my attention about discord or dissatisfaction between Mr. Black-Wickliffe and Mr. Swanson. When the Court sees that the Court is obligated to step in and have a hearing and find out what we do about that and there wasn't any hint at all of any of that.

As the Court read the written submissions by Mr. Black-Wickliffe the Court could not reach the conclusion that he was claiming that he was not the shooter or that he was truly innocent. Those written submissions challenged things like the difficulties with eyewitness testimony and things like that. And I went back and I re-read the salient portions of the preliminary examination transcript and with the no-contest plea the Court doesn't elicit the facts from the defendant but the Court has to establish some other reason for concluding that we have guilt. And so in this case the attorneys agreed that the Court could read the preliminary examination transcript. And the testimony of at least one witness is pretty clear that Mr. Black-Wickliffe is the shooter here.

Now Mr. Stanley is right. The Court I mean I try to reserve judgment here and I don't know that I, until we got to this point, had a firm conviction about Mr. Black-Wickliffe's guilt or innocence or anything. But I'm saying this. That there is solid testimony in the preliminary examination transcript supporting the guilt here. And aside from the things that Mr. Stanley has seen, I am unaware of any other irregularities in the case that the Court should factor in, in assessing the interest of justice.

In the end it sounds to me like this motion is driven by concerns about sentence and the case law is pretty clear that that standing alone does not comprise the interest of justice. And that conclusion is buttressed by the phone calls that Mr. Hedges recites where Mr. Black-Wickliffe is talking to a confidant and it sounds like at least a big part of that conversation was getting the number low, from 28 to 20 or something like that. Now Mr. Black-Wickliffe has "chiseling" rights to argue that number should come down anyway. But it sounds to me like the predominant thing driving this motion here today is concern about sentence and that doesn't satisfy it and so for all those reasons the Court respectfully denies the motion to set aside the plea.

(Sentencing Hr'g Tr., ECF No. 6-6, PageID.467-471.)

As the quoted passage makes clear, the trial court expressly rejected Petitioner's claims and found that defense counsel was not ineffective. The court noted that Petitioner did not demonstrate that trial counsel failed to prepare, and it concluded that counsel had obtained a significant plea agreement for Petitioner. The court also noted the strength of the evidence presented

- 19 -

at the preliminary examination. In addition, at an earlier point in the proceeding, the Court referenced the jail record presented by Petitioner, indicating that it showed at least three conferences at the jail, and that other conferences had occurred at the court. (*Id.*, PageID.444-445, 455-56.) Further, contrary to the claim of Petitioner's second attorney at the time of the hearing on the motion to withdraw, the court observed Petitioner had said nothing in his submissions to the court about being actually innocent of the offense. Instead, the court held, Petitioner focused on the unreliability of eyewitness testimony and other things. (*Id.*, PageID.469.) The court therefore found that Petitioner made the claim in an attempt to obtain a better plea agreement. That finding is entitled to a presumption of correctness, *see* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429.

Petitioner utterly fails to overcome the court's factual finding that his claim of ineffective assistance of counsel arose out of his desire to obtain a better plea agreement. Petitioner's self-serving declaration that he would have gone to trial if he had not been coerced by his attorney is at odds with his sworn declaration at the time of the plea that he had been made no promises other than those on the record, that he had not been threatened, and that his decision to plead was a matter of his own free will. Petitioner's argument that counsel lied about his family's wishes simply does not stand up in the face of Petitioner's own telephone calls, indicating that he thought he could get a better plea offer with his new attorney. Under these circumstances, the trial court's findings were entirely reasonable on the facts, and the court's denial of his claim of ineffective assistance constituted a reasonable application of clearly established Supreme Court precedent.

## Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong. Therefore, I recommend that a certificate of appealability should be denied.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.


Date:  August 9, 2017

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).